## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**VILLAGE OF HOBART, WISCONSIN,**

        **Plaintiff,**

    **v.**                                       **Case No. 23-C-1511**

**UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,**

        **Defendants,**

      **and**

**ONEIDA NATION,**

        **Intervenor Defendant.**

---

## DECISION AND ORDER DENYING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

---

The Village of Hobart filed this action challenging the Department of Interior's decision to take land into trust for the Oneida Nation pursuant to Section 5 of the Indian Reorganization Act (IRA) of 1934, 25 U.S.C. § 5108. The Village asserts that the agency's determination violates the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, and the United States Constitution. The court has jurisdiction over this action under 28 U.S.C. § 1331.

Although the Village's action is one for judicial review of a decision by the Department of Interior, the Village seeks summary judgment pursuant to Fed. R. Civ. P. 56(a). Summary judgment, which asks whether there are factual disputes the court must resolve that prevent the entry of judgment as a matter of law, is not the proper vehicle for resolving an action seeking judicial review of agency action under the APA. In an action seeking judicial review of agency action, the court does not decide whether there are material facts in dispute. Instead, the court is

limited to deciding whether the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). The briefing and arguments presented by the parties on the Village's motion nevertheless present their respective positions on the questions the court must decide, and, for the reasons that follow, the decision of the Department of Interior will be affirmed.

## BACKGROUND

This case represents another chapter in the ongoing dispute between the Village of Hobart and the Oneida Nation concerning their respective jurisdiction over land located within the Oneida Tribe's original reservation. The underlying history and background of this dispute was recounted in *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 542 F. Supp. 2d 908 (E.D. Wis. 2008), and *Oneida Nation v. Village of Hobart*, 968 F.3d 664 (7th Cir. 2020), and will not be repeated in detail here. The specific dispute in this case is over the decision of the Secretary of the Department of Interior to grant the Nation's application to have eight properties totaling 21 parcels and 499 acres of land acquired into trust by the United States for the benefit of the Nation.

The IRA authorizes the Secretary of the Interior to acquire land and place it into trust for individual Indians and tribes "for the purpose of providing land for Indians." 25 U.S.C. § 5108. Enacted in 1934, the IRA set tribes on a potential collision course with the municipalities that had been established within the original reservation boundaries during the allotment period, which began with the passage of the Dawes Act in 1887. The effect of granting fee-to-trust applications is that it removes the land placed in trust from state and local jurisdictions and exempts such land from state and local taxation. This results in shrinkage of the tax base of the local government in which the property is located and the elimination of state and local government authority to enforce zoning, public safety, or environmental regulations on the land. 25 C.F.R. § 1.4. Thus, a tribe's

interest in recovering its original reservation is in conflict with the interests of local governments established within the reservation boundaries in preserving their tax base and enforcing their local ordinances. State and local governments with jurisdiction over the lands that are subject to fee-to-trust applications therefore have a strong interest in the process.

The potential for conflict between tribes and the municipalities established within their original reservation boundaries lay dormant when the IRA was first enacted. Although the IRA halted the allotment of the remaining tribal land and allowed for the reacquisition of the tribal lands that had already been conveyed to individuals, the vast majority of land on some reservations had already been sold by the time the IRA was enacted, the tribes lacked the resources to repurchase land themselves, and Congress did not fund reacquisition of lands that had been previously sold. *Oneida Tribe*, 542 F. Supp. 2d at 912–13; *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.05 (Nell Jessup Newton ed., 2012). With the advent of Indian gaming, however, this changed. Fueled by the commercial revenue they were able to acquire through gaming beginning in the 1970s, many tribes, including the Oneida Nation, set as their goal "the repurchase and recovery of all original reservation lands." *Id.* at 913; *see also* COHEN'S HANDBOOK § 12.01. This is the context in which the current dispute arises.

On April 12, 2006, the Business Committee of the Oneida Nation enacted several resolutions requesting that the Bureau of Indian Affairs (BIA) accept parcels of fee land owned by the Nation into trust. In 2007, the Nation submitted 56 fee-to-trust applications to the BIA for 133 parcels containing 2,673 acres of land. The parcels are all located within the Village, which is located within the outer boundaries of the original Oneida Reservation. *See Oneida Nation*, 968 F.3d at 671. The Village received notice of the applications and submitted its comments opposing the applications.

3

The Midwest Regional Director of the BIA ruled in favor of the Nation and issued six Notices of Decision to accept certain parcels into trust for the benefit of the Nation. In 2010, the Village timely appealed the six Notices of Decision to the Interior Board of Indian Appeals (IBIA). On May 9, 2013, the IBIA concluded that while the Regional Director had authority to take the land into trust, she failed to consider tax loss implications, potential land use conflicts, and jurisdictional problems. *See Vill. of Hobart v. Acting Midwest Regional Director*, 57 IBIA 4, 2013 WL 3054077 (2013) (*Hobart I*). The IBIA vacated the Regional Director's Notices of Decision and remanded the matter for the Regional Director to consider these issues as well as the Village's arguments with respect to environmental impacts and bias in decision making. The IBIA did not consider the Village's arguments regarding the constitutionality of the IRA, finding that it lacked jurisdiction to do so.

On January 19, 2017, the Regional Director issued a decision that accepted some of the fee land into trust. *See* Dkt. No. 32-4 at 28–59. The Village again appealed the Regional Director's decision to the IBIA. As part of its appeal, the Village asserted that the Regional Director's decision was the product of bias due to the decision being processed and issued under a Memorandum of Understanding (MOU) entered into between the BIA and a number of tribes, including the Nation. The BIA and the Nation entered into the MOU to facilitate the expeditious processing of fee-to-trust applications. Dkt. No. 1-3 at 2. In accordance with the MOU, the BIA hired additional employees to process the fee-to-trust applications, and the tribes funded the salaries of those additional employees. The Village argued that because the fee-to-trust applications were processed by employees whose jobs were funded by the Nation, the decisions were not the product of a neutral, independent decisionmaker. It claimed that the MOU fostered improper *ex parte* communications, created an impermissible conflict of interest, and is contrary

4

to the Indian Self-Determination and Education Act, 25 U.S.C. § 5301, *et seq.*, and the Tribal Self-Governance Act, 25 U.S.C. § 5361, *et seq.* The IBIA rejected the Village's claim of bias and affirmed the Regional Director's decision in full on September 21, 2023. *See Vill. of Hobart v. Acting Midwest Regional Director*, 69 IBIA 84, 2023 WL 6458987 (2023) (*Hobart II*).

On November 10, 2023, the Village commenced this action under the APA against the United States Department of the Interior; Deb Haaland, in her official capacity as the United States Secretary of the Interior; the BIA; Tammie Poitra, in her official capacity as the Midwest Regional Director of the BIA; the Acting Midwest Regional Director of the BIA; and the IBIA. The Village seeks to vacate the IBIA's decision on the ground that it is arbitrary and capricious and represents an abuse of discretion. The Village asserts that the BIA and the IBIA violated its right to due process as a result of the bias created by the MOU. The Village also challenges the constitutionality of the IRA, 25 U.S.C. § 5108, and 25 C.F.R. § 1.4.

## LEGAL STANDARD

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The APA authorizes a court to set aside an agency action or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). An agency decision will be found "arbitrary and capricious" if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

5

A court "reviews agency determinations with great deference, and the court cannot substitute its judgment for that of the agency." *Smith v. Garland*, 103 F.4th 1244, 1252 (7th Cir. 2024) (citations omitted); *see also F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."). While an agency's decision is presumed to be valid, courts must still "engage in a 'substantial inquiry,' or in other words, 'a thorough, probing, in-depth review.'" *Pozzie v. U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)). With these considerations in mind, the court turns to the substance of the Village's challenges to the argument for review of the Department's decision.

## ANALYSIS

### A. Bias

The Village asserts that the decisions to grant the Nation's fee-to-trust applications are administratively biased and prejudged in violation of the APA and the Due Process Clause of the Fifth Amendment. At the outset, the court is required to assure itself that the Village has standing to bring its Fifth Amendment Due Process Clause claim. *See Town of Chester, New York v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks and citations omitted)). Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). The doctrine of standing is not an esoteric doctrine that courts use to avoid difficult decisions; it "serves to prevent the judicial process from being used to usurp the powers of the political

branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "The familiar 'triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement.'" *Garcia v. SigmaTron Int'l Inc.*, 986 F.3d 1058, 1064 (7th Cir. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998)). The plaintiff bears the burden of establishing each element. *Id.* (citation omitted).

The Nation asserts that the Village lacks standing to claim due process protection because it is a municipality, not a person. The Fifth Amendment provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. Citing *City of East St. Louis v. Circuit Court for the Twentieth Judicial District*, 986 F.2d 1142 (7th Cir. 1993), the Nation asserts that the Seventh Circuit adopted the rule that municipalities are not "persons" for purposes of the Due Process Clause. In that case, the City of East St. Louis and its mayor brought a 42 U.S.C. § 1983 action against a state circuit court arising out of the state court's conveyance of the city hall to a prevailing party to satisfy a judgment against the city. *Id.* at 1143. The Seventh Circuit held that the city lacked standing to assert its claim, reasoning that "[m]unicipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause." *Id.* at 1144. The court explained that "[b]ecause East St. Louis is not a 'person,' it cannot invoke the protection of the Fifth or Fourteenth Amendments, and therefore cannot bring a section 1983 claim." *Id.* (citing *Vill. of Arlington Heights v. Reg'l Transp. Auth.*, 653 F.2d 1149, 1152 (7th Cir. 1981)).

The Village argues that *City of East St. Louis* is factually and legally distinguishable from the instant case. It contends that, in finding that municipalities are not "persons" under the Due Process Clause, the Seventh Circuit relied on the principle that municipalities are creatures of a state and therefore lack any constitutional rights against the state. The Village maintains that,

7

while it cannot challenge the action of its creator, the State of Wisconsin, it can invoke due process protections against the federal government. But regardless of whether a municipality brings an action against the state or the federal government, because a municipality is not a "person," it "cannot invoke the protection of the Fifth or Fourteenth Amendments." *Id.* at 1144. Therefore, the Village lacks standing to assert a due process claim against the Federal Defendants.

Even if the Village had standing to assert a claim under the Due Process Clause, it would fail on the merits. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'" *Dusenberry v. United States*, 534 U.S. 161, 167 (2002). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). A procedural due process analysis consists of two steps: "First, we must identify the protected property or liberty interest at stake. Second, if the plaintiff was deprived of one of those interests, we must determine what process was due under the circumstances." *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023) (citation omitted).

The Village claims that it has a constitutionally protected property interest in the continued collection of real property taxes. To demonstrate a procedural due process violation of a property right, the plaintiff must show that there is "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (citation omitted). A property interest protected by the Fifth or Fourteenth Amendment consists of more than a mere unilateral expectation of the claimed interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Instead, the plaintiff must "have a

legitimate claim of entitlement to it." *Id.* This entitlement must be established by statutes or regulations that delimit the scope and the condition of the right. *Id.*

Under Wisconsin law, the Village has the power to tax for the purposes of government. *See* Wis. Stat. § 61.46(1) ("The village board shall, on or before December 15 in each year, by resolution to be entered of record, determine the amount of corporation taxes to be levied and assessed on the taxable property in such village for the current year."). Yet state law does not set a minimum tax base or quantify the amount of taxes a municipality is entitled to. Thus, the Village has no more than a unilateral expectation in the continued collection of real property taxes. Because the Village has no protected property interest in future real property taxes, its procedural due process claim fails on this basis.

Although the heightened protections of the Fifth Amendment Due Process Clause do not apply here, the Village is still entitled to the procedural considerations subsumed in the APA's arbitrary and capricious standard. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). The Village argues that the entire fee-to-trust process is tainted by bias as a result of the Midwest Region Memorandum of Understanding. The MOU is a "consortium" agreement that allows participating tribes, including the Nation, to consent to the reprogramming of federal funds to supplement BIA staff to more quickly process fee-to-trust applications. Dkt. No. 1-3. The "sole duties and responsibilities" of the employees and contract staff hired with these funds are "to process fee-to-trust applications and reservation proclamations." *Id.* at 2. The Village contends that, as a result of this "pay-to-play" structure, the BIA was pressured to approve trust applications so that it could keep the additional funding. Dkt. No. 57 at 11. It asserts that the Federal Defendants' decisions are administratively biased and prejudged in violation of the APA and that it is entitled to an independent, neutral decisionmaker.

As the IBIA explained, "[a] party must do more than simply allege bias to show that it has been denied a 'fair tribunal.'" *Hobart II*, 69 IBIA at 102. "Adjudicators enjoy a 'presumption of honesty and integrity,' and overcoming that presumption requires an appellant to carry a 'difficult burden of persuasion.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). To succeed on its claim, a party must either make a "substantial showing of bias" or establish that the decisionmaker had a "pecuniary interest in the outcome" of the applications. *Id.* (citations omitted). The Regional Director found that the Village's claims of bias did not satisfy the difficult burden of overcoming the presumption that the Regional Director discharged her duties properly in approving the Nation's applications. Dkt. No. 32-4 at 52. The IBIA concluded that the Village had not met its burden to show that the Regional Director erred. *Hobart II*, 69 IBIA at 87.

First, the Village asserts that the Federal Defendants ignored the specific terms of the MOU showing structural bias. It notes that the MOU was created because of "[t]he need for increased land base" for tribes, that its purpose is to get land "accepted into trust," and requires BIA employees to "assist the Participating Tribes in eliminating or mitigating any of the Solicitor's objections." Dkt. No. 70 at 11 (quoting Dkt. No. 1-3 at 2, 5). The Village argues that the IBIA ignored that the MOU's "whole purpose is to have BIA work with tribes to get applications 'accepted.'" Dkt. No. 57 at 18.

The IBIA rejected the Village's claim that the Midwest MOU created an unlawful "structural bias." *Hobart II*, 69 IBIA at 104. It stated that Congress authorized the BIA to take land into trust for Indians and directed the BIA to advance the causes of Indian self-determination and self-government. *Id.* (citing 25 U.S.C. § 5108). The IBIA observed that while the Midwest MOU states that "the need for increased land base is imperative to the Tribes of Minnesota, Wisconsin, Michigan, and Iowa," that is simply a restatement of the policies that Congress had set

for the BIA and does not disqualify the BIA from deciding trust applications. *Id.* at 105 (quoting MOU at 1). It noted that both the IBIA and the courts have rejected the argument that the BIA's pursuit of those goals makes the agency "structurally biased" and disqualifies it from deciding fee-to-trust applications. *Id.* at 104 (collecting cases). The IBIA also indicated that the Midwest MOU states that the purpose of the agreement is "facilitating the expeditious processing of fee-to-trust applications." *Id.* at 105 (citing MOU at 1). But the IBIA explained that the BIA's commitment to processing applications more quickly is not evidence that it has prejudged applications and does not equate to pre-approval of applications. *Id.* Though the Village asserts that the Division does not deny applications, nothing in the MOU created a commitment for the BIA to approve applications. *Id.* The IBIA observed that the record suggested that the Regional Director had not denied any applications since 2008 because the tribes withdraw applications that are not likely to be approved, rather than risk a denial. *Id.* at 105.

Second, the Village argues that the Federal Defendants ignored evidence in the administrative record of alleged bias, including prejudgment, direct pecuniary interest, impermissible communications, and conflicts of interests within the BIA. The Village asserts that the Regional Director and other BIA employees, including Division employees, engaged in *ex parte* communications with the Nation about the trust applications and the issue of bias. The IBIA explained that, if this were a formal adjudication under the APA, the Regional Director would be barred from engaging in off-the-record communications on the merits of the proceeding with interested parties. *Id.* at 106. But because these proceedings are informal, the APA's restrictions on *ex parte* communications do not apply. *Id.* The IBIA also noted that the BIA's regulations require the agency to communicate with the tribal applicant, as well as state and local governments, to evaluate the applications. *Id.* (citing 25 C.F.R. §§ 151.10; 151.12). The IBIA found that none

11

of the meetings or communications the Regional Director or BIA employees had with the Nation improperly influenced the Regional Director's decision or resulted in actual bias. *Id.* at 107.

Next, the Village asserts that the MOU allows for tribal influence through an Oversight Advisory Council and that the participating tribes are invited to semi-annual and annual meetings with the Regional Director to discuss the Division's accomplishments under the MOU. The Village contends that processing applications under the MOU is "inherently biased" because the participating tribes (including the Nation) pay the salaries of the Division employees. It asserts that Division employees draft decisions for the outcome of acceptance and that "[h]aving to ensure the tribes remain happy (i.e., their applications are approved) in an effort to keep your job, is certainly a disqualifying pecuniary interest." Dkt. No. 57 at 19. The IBIA found that the Village failed to point to any statements or actions by the Regional Director or any BIA employee demonstrating that the Regional Director prejudged these specific applications or that the adjudicator had a pecuniary interest substantial enough that the risk of unfairness was intolerably high. The Village points to emails showing that the Regional Director and Division employees prioritized the Nation's applications after the remand. It contends that the Nation should not be able to dictate to the BIA what applications it should prioritize. The IBIA explained that "prioritizing a decision is not the same as prejudging the result of that decision." *Hobart II*, 69 IBIA at 105.

As for any disqualifying interest based on the MOU's funding structure, the IBIA conceded that the Midwest MOU "appears to have given Division employees some interest in having these trust applications resolved, although it is not clear whether the degree and nature of that interest would disqualify them from deciding the applications." *Id.* at 108. It explained that, while Division employees do not have the kind of direct pecuniary interest in the resolution of the

applications that have been found disqualifying, Division employees would likely lose their jobs if the tribes stopped participating in the Midwest MOU. *Id.* The IBIA noted that though the Midwest MOU had been revised to limit the participating tribes' ability to influence the selection, performance awards, and duties and responsibilities of the federal consortium staff as well as the role of the tribes in hiring Division staff, these revisions did not change the fact that the tribes control the purse strings from which the consortium staffs' salaries are dependent. *Id.*

The IBIA ultimately concluded that it need not decide whether the Midwest MOU disqualified Division employees from deciding trust applications because Division employees do not decide the applications, the Regional Director does. It stated that it did not see how Division employees assisting in drafting decisions showed prejudgment or bias, as long as the Regional Director completed her own independent review and reached her own decision. *Id.* at 105. Even though the Regional Director oversees Division employees, the Regional Director is not an employee of the Division, her position is not funded by the Midwest MOU, and she would not lose her job even if all tribes stopped participating in the Midwest MOU. As a result, the IBIA concluded that the Regional Director was not "subject to the conflict of interest that allegedly disqualified Division employees from adjudicating these applications." *Id.* at 110. In other words, "even if Division employees had a conflict of interest here, the Regional Director's independent review cured that conflict of interest." *Id.*

The Village maintains that the Regional Director "rubber stamped" the final Remand Decision drafted by Division employees and did not conduct her own independent review. It contends that, if the Regional Director had actually reviewed the final decision, such evidence would be in the record. But the IBIA rejected the Village's contention, explaining that a legal presumption of regularity supports the official acts of public officers acting in their official

13

capacities. The IBIA concluded that the Village failed to meet its burden to present evidence to support its allegations that the Regional Director did not independently review the decisions drafted by Division employees. *Id.* at 110–11. It reasoned that the administrative record did show that the Regional Director undertook her own independent review of the trust applications, the Village's comments, and the related Notices of Decision and that the comprehensiveness of the Regional Director's decision belies the Village's claim that she undertook no independent review. *Id.* at 111.

Third, the Village argues that the decisions must be vacated because the Regional Director and the IBIA did not perform a complete review of the record. In particular, the Village asserts that the Regional Director and the IBIA did not fully review a 2005 Interior Office of Inspector General's Report summarizing its investigation of MOU agreements (IG Report) referenced in a 2006 Government Accountability Office report. In *Hobart I*, the IBIA directed the Regional Director to "address the Village's allegations of bias as well as the outcome of the IG investigation and its relevance, if any, to the Village's allegations." 57 IBIA at 16.

In the Remand Decision, the Regional Director concluded that the IG Report had no bearing on the Village's bias claim because the report found no instances of actual bias and centered on the terms of the Pacific MOU then in use, not the Midwest MOU. Dkt. No. 32-4 at 47. She explained that the MOUs in effect at the time of the IG Report had long since expired and were replaced by the restructured MOUs. *Id.* The IBIA found that, in the Remand Decision, the Regional Director sufficiently reviewed the IG investigation. *Hobart II*, 69 IBIA at 111–12.

The Village asserts that the Regional Director and the IBIA relied on a redacted, incomplete version of the IG Report. But as the IBIA observed, the redactions appeared to mostly be employee

names.  *Id.* at 112.  The IBIA concluded that the Village had not explained why the redacted information would have made any difference to the Regional Director's analysis.  *Id.*

The Village also asserts that the Regional Director and the IBIA did not review a Solicitor's Opinion that was attached to the IG Report.  Even though the IG Report summarized the conclusions contained in the Solicitor's Opinion, the Village contends that the Regional Director should have fully considered the opinion itself.  The IBIA concluded that the Regional Director's decision, taken together with the record, was more than sufficient to reasonably discern her path. It explained that the remand order required the Regional Director to review the "outcome of the IG investigation," not the documents on which it was based.  The IBIA stated that nothing in the remand order required the Regional Director to analyze the report more exhaustively, especially when she concluded that it was not relevant to her decision.  *Id.*

Finally, the Village argued before the IBIA that the MOU is illegal because it is inconsistent with the terms of the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 5301, *et seq.*, and the Tribal Self-Governance Act (TSGA), 25 U.S.C. § 5361, *et seq.*  The IBIA found that the Village did not have standing to bring the claim because it had not explained how its legally protected interests were harmed by the reprogramming of funds authorized by the Midwest MOU and it failed to show that its interests fall within the zone of interests protected by the ISDEAA and TSGA.  *Hobart II*, 69 IBIA at 113.  Even if the Village had standing to bring these claims, the IBIA concluded that the Village had not shown that the Midwest MOU was unlawful.  *Id.*

Ultimately, the Village's arguments assume that the IRA requires the Secretary of the Interior to act in an adjudicatory capacity, making the essential factual findings needed to support a decision granting or denying the pending application.  But that is not the procedure Congress

established for land acquisitions under the IRA. As part of its goal of ending the assimilationist policy reflected in the allotment of tribal lands, Congress sought to improve the economic status of Indians by authorizing the Secretary "in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . within or without existing reservations . . . ." 25 U.S.C. § 5108. The IRA says nothing about the interests and rights of municipalities that were established within the original reservation boundaries. The Department has promulgated regulations intended to guide the Secretary in exercising the discretion which the statute affords. 25 C.F.R. § 151.10.[1] But the regulation does not establish any minimal finding the Secretary must make before granting a tribe's application to have its land placed in trust. It lists the criteria the Secretary will consider in evaluating requests for the acquisition of land in trust status and the procedure that will be used to provide interested parties notice and an opportunity to comment. That procedure was used here.

As the following section shows, the Regional Director and IBIA thoroughly explained that the Village had failed to establish bias. Their decision that the Village failed to meet its burden was reasonable. Because the Regional Director and the IBIA considered the administrative record and made no clear error of judgment or law, their decisions cannot be deemed arbitrary and capricious or an abuse of discretion. To the extent the Village believes this procedure unfair, its remedy lies with Congress, not the courts.

## B. 25 C.F.R. § 151.10 Factors

The Village asserts that the Federal Defendants' decisions were arbitrary and capricious because they failed to adequately consider the factors set out in 25 C.F.R. § 151.10. The Village

---

[1] The regulation in effect today is different from the regulation that was in effect during the Federal Defendants' decisions. References to the regulation are to those provisions in effect at the time of the Federal Defendants' decisions.

16

has the burden to demonstrate that the BIA's consideration of the regulatory factors was arbitrary and capricious. *See South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005). It must "present evidence that the agency did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect." *Id.* The BIA is not required to "exhaustively analyze every factor but must base its determination upon factors listed in the appropriate regulations and must use a reasonable interpretation of the regulation and the statute in reaching its conclusion." *Id.* (internal quotation marks and citation omitted).

The Village takes issue with the Federal Defendants' analysis of the cumulative tax impacts of potential future acquisitions and the lack of compensation for fire protection and road maintenance under 25 C.F.R. § 151.10(e), jurisdictional problems and land use conflicts under 25 C.F.R. § 151.10(f), and environmental considerations under 25 C.F.R. § 151.10(h). The Village also asserts that the passage of time between decisions, including the six Notices of Decision, requires that the decisions be vacated for further consideration. The court will address each argument in turn.

### 1. 25 C.F.R. § 151.10(e)

Section 151.10(e) requires the BIA to consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls." 25 C.F.R. § 151.10(e). The Village asserts that the Federal Defendants violated the APA by disregarding the cumulative tax effects of future trust acquisitions. It contends that the Nation had trust applications for 133 parcels comprising 2,673 acres located within the Village, including the eight parcels under consideration by the Federal Defendants, which would result in a total property tax loss of $36,148.88. The Village asserts that the Federal Defendants ignored the reality that the "system

17

is set up to approve applications" and that it should not view each acquisition in isolation. Dkt. No. 57 at 27–28.

Section 151.10(e) contains no requirement that the BIA consider the cumulative impact of possible future acquisitions. Instead, the BIA is only required to consider the present impact of the proposed trust acquisitions under consideration on the tax rolls. *See Shawano County v. Acting Midwest Regional Director*, 53 IBIA 62, 80 (2011). In this case, the Federal Defendants considered the tax impact of placing the parcels into trust. They estimated that, based on tax information for fiscal year 2015, the acquisitions would cause the Village to lose $3,997.90, or 0.1443% of its tax levy. *Hobart II*, 69 IBIA at 94.

The Village asserts that the Federal Defendants ignored the Village's inability to increase its tax levy to address the effects of cumulative loss and continue to fund the public services it must provide to its residents, both tribal and nontribal, such as fire protection and road maintenance and repair. It explains that Wisconsin law limits the amount the Village may increase taxes each year and that raising taxes on nontribal land would significantly increase the burden of those who pay taxes.

The Regional Director considered the Village's comments regarding the loss of funding for public services, fire protection, and road maintenance. She acknowledged the Village's concern that it could not raise taxes above a 2% levy limit but concluded that the Village had not provided sufficient information to properly analyze its concerns about speculative future losses. Dkt. No. 32-4 at 35. The Regional Director also observed that Brown County and other nearby municipalities have executed service agreements with the Nation regarding the delivery of services to tribal lands and that the Nation and the Village had previously entered into such an agreement in the past. *Id.* at 34. She stated, "Contrary to the Village's contention, documents provided by

18

the Oneida Nation show that it has made clear that it is open to negotiating new service agreements, which may include payments in lieu of taxes, if the Village were to recognize the Nation as a government pursuant to federal law." *Id.* The Regional Director noted that, without an intergovernmental agreement in place, there is a possibility that emergency services for fire protection provided by the Village could go uncompensated, but that the Village provides these services to other tax-exempt properties, such as churches and schools. *Id.* at 35. She explained that, although fire protection is paid through property taxes, the Village did not provide specific information regarding the cost of fire protection. *Id.* While the Village asserts that it was never required to submit specific cost information about its programs and services, the Regional Director was not required to ask for documents supporting the Village's comments.

As for road maintenance and repair, the Regional Director noted that the Village raised the issue of the significant cost of repair for three roads. The Regional Director determined that, though the roads service private fee parcels and Oneida Trust land, they do not directly service any of the proposed acquisitions currently under consideration. *Id.* She also noted that Federal funding is available through the BIA's Tribal Transportation Program that could "partially offset" road maintenance costs, even though the Nation, and not the Village, receives the federal funding. *Id.*

The Regional Director concluded that the Village's objections did not justify exercising her discretion against trust acquisition. The IBIA explained that the Regional Director "need not resolve all objections raised in such comments to the commenter's satisfaction" and found that the Regional Director had adequately considered the issues and did not abuse her discretion. *Hobart II*, 69 IBIA at 118. The Federal Defendants' consideration of this factor was sufficient and supported by a rational basis.

19

## 2.  25 C.F.R. § 151.10(f)

Section 151.10(f) requires the BIA to consider "jurisdictional problems and potential conflicts of land use which may arise" as a result of taking land into trust for a tribe.  25 C.F.R. § 151.10(f).  The Village argues that the Board erroneously affirmed the Regional Director's consideration of § 151.10(f) by concluding that the Regional Director is not required to resolve, prevent, or weigh potential jurisdictional problems.  Contrary to the Village's assertion, however, the Federal Defendants are not required to resolve any conflicts; they must only consider whether those conflicts warrant denial of an application.  *See Cnty. of Charles Mix v. U.S. Dep't of Interior*, 799 F. Supp. 2d 1027, 1046 (D.S.D. 2011) ("The BIA fulfills its obligation under Section 151.10(f) as long as it undertakes an evaluation of potential problems." (cleaned up) (internal quotation marks and citation omitted)).  The Federal Defendants evaluated the potential jurisdictional problems presented by the Village.

The Village asserts that the Federal Defendants failed to adequately consider stormwater management disruptions.  The Federal Defendants acknowledged that the trust acquisition would complicate the Village's efforts to improve stormwater management, given the fact that two separate programs would need to be implemented, but concluded the issue has been resolved because jurisdiction is clear.  Citing *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 732 F.3d 837 (7th Cir. 2013), the Village asserts that, contrary to the Federal Defendants' views, the jurisdictional conflict will only be exacerbated by trust acquisition because the Village and the Nation must implement separate stormwater management programs.   Even though the Village disagrees with the Federal Defendants' conclusion, the Federal Defendants recognized and considered the potential jurisdictional concern.  That is all that is required under the regulations.

The Village also argues that the Federal Defendants failed to consider the Tribe's ability to checkerboard by trust acquisition and thwart the Village's development through its own comprehensive zoning. It contends that the Federal Defendants ignored the Village's concern that there would be different zoning designations within a single zone if the land is held in trust. For example, the Nation will designate the Gerbers property as residential and agricultural, even though it is located within the middle of land zoned and designated by the Village as mixed commercial/industrial. The Regional Director considered these concerns and found that the location of light industrial development adjacent to residential development is not unique within the Village. She noted that the Village had itself "created the same situation unilaterally by placing agricultural and industrial zoning districts immediately adjacent to one another." Dkt. No. 32-4 at 36–37. The Regional Director concluded the zoning impacts would be minimal because the Nation had not proposed any change in use, and the Village had not raised any material conflict between existing uses and Village zoning. *Id.* at 37.

The Village further argues that the checkerboard jurisdictional pattern creates difficulty with providing emergency services. The Regional Director considered this issue and concluded that the "most feasible solution to the 'checkerboard' issue is the development of [a] cooperative service agreement." *Id.* at 39. She observed that the "inability of the Village and Nation to execute an intergovernmental service agreement contributes to the jurisdictional conflict" but noted that such agreements are ultimately not required by the BIA. *Id.*

The Regional Director concluded that the Village's jurisdictional concerns did not bar the Federal Defendants from acquiring the land into trust. The IBIA concluded that the Regional Director's consideration of § 151.10(f) was sufficient. *Hobart II*, 69 IBIA at 123. The Federal Defendants' consideration of this factor was not arbitrary and capricious.

### 3. 25 C.F.R. § 151.10(h)

Section 151.10(h) requires the BIA to consider "[t]he extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures [NEPA], and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations." 25 C.F.R. § 151.10(h). As an initial matter, the Village argues that the IBIA's decision regarding standing must be rejected. Even though the IBIA concluded that the Village lacked standing to advance its § 151.10(h) arguments, it ultimately rejected the Village's arguments on the merits. In short, the Federal Defendants' decision was not arbitrary and capricious on this basis.

The Village does not assert that the Regional Director erred in her consideration of the criterion set out in § 151.10(h). Instead, it argues that the Federal Defendants (1) failed to comply with the agency's NEPA compliance regulations by relying on outdated categorical exclusions and Phase I environmental site assessments and (2) did not conduct interviews with state and/or local agency officials, as required by Part 602. With respect to the Phase I assessments, the administrative record shows that the Federal Defendants complied with the required Phase I assessment within one year of the renewed Notice of Decision. Dkt. No. 35-12 at 41. The renewed Notice of Decision is dated January 19, 2017. The BIA prepared and approved site assessments in September 2016. It subsequently determined there was no change in use of any of the parcels, so no further compliance with NEPA was required. Dkt. No. 32-4 at 42–45. In addition, the 180-day deadline to update the assessment applies after the acquisition, not before. Dkt. No. 35-12 at 41. The Village also argues that the Federal Defendants erred in not conducting interviews with state and/or local agency officials. But, as the Federal Defendants explain, the regulations do not require consultation with the Village itself, only environmental professionals of any state or local

22

government.  Dkt. No. 32-4 at 43 (citing ASTM 1527).  The Federal Defendants' consideration of § 151.10(h) was not arbitrary and capricious.

### 4.  Passage of Time

Finally, the Village argues that the passage of 15 years since the issuance of the Notices of Decision requires that the decision be vacated and remanded for further consideration of the regulatory factors.  But the passage of time alone does not render the Regional Director's consideration of the regulatory factors stale.  In any event, the passage of time here is a function of the procedural history of this case, including multiple appeals and decisions.  The Village has not demonstrated that the case should be remanded on this basis.

## C.  IRA Claims

The Village asserts that Section 5 of the IRA is unconstitutional.  Section 5 of the IRA states:

**Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption.**

The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisitions, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.

The unexpected balances of any appropriations made pursuant to this section shall remain available until expended.

Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 5108. The Village argues that the broad and unlimited grant of extraordinary power to the Secretary of the Interior to acquire any interest in lands, within or without existing reservations, for the purpose of providing land for Indians is problematic for two reasons.[2] First, it claims that Section 5 exceeds Congress's power under the Indian Commerce Clause. Second, it asserts that Section 5 violates the nondelegation doctrine.

### 1. Indian Commerce Clause

The Village asserts that Section 5 of the IRA is unconstitutional because it exceeds Congress's plenary power under the Indian Commerce Clause. It argues that the Indian Commerce Clause only vests Congress with authority over trade and, thus, Congress exceeded its authority when it enacted Section 5 of the IRA. To support its position, the Village cites Justice Thomas' dissent from the denials of certiorari in *Upstate Citizens for Equity, Inc. v. United States*, 583 U.S. 1004 (2017), where he states that "the Indian Commerce Clause does not appear to give Congress the power to authorize the taking of land into trust under the IRA." *Id.* at 2587 (Thomas, J., dissenting).

---

[2] The Village raised additional constitutional challenges in its complaint. In particular, it asserts that the IRA is unconstitutional under the Enclave Clause, under the Fifth, Tenth, and Fourteenth Amendments, and because it deprives the Village of its right to a republican form of government. *See* Compl. ¶¶ 69, 73, 77, 84–85, Dkt. No. 1. The Village also claims that 25 C.F.R. § 1.4 is unconstitutional. *See id.* ¶ 91. By not raising arguments relating to these claims in its opening brief, it appears the Village has abandoned these claims. The Federal Defendants assert that, by not discussing these claims in its opening brief, the Village waived these arguments. Dkt. No. 64 at 31 (citing *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("[A]rguments not raised in an opening brief are waived.")). The Village did not respond to the Federal Defendants' waiver argument. For these reasons, the Village's other claims regarding the constitutionality of 25 U.S.C. § 5108 and 25 C.F.R. § 1.4 are dismissed.

But the majority of the Court has not adopted Justice Thomas' view. The Supreme Court has long held that "the central function of the Indian Commerce Clause is to provide Congress with the plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). Although the Court has acknowledged that "Congress's authority to legislate with respect to Indians is not unbounded," it has broadly defined Congress's plenary power to concern "not only trade, but also 'Indian Affairs.'" *Haaland v. Brackeen*, 599 U.S. 255, 276, 278 (2023) (citations omitted). The Court explained that it has "not doubted Congress's ability to legislate across a wide range of areas, including criminal law, domestic violence, employment, property, tax, and trade." *Id.* at 275 (citations omitted). Consistent with this understanding, the court concludes that Section 5 of the IRA is constitutional under Congress's plenary power.

### 2. Nondelegation Doctrine

The Village argues that Section 5 also violates the nondelegation doctrine. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Article I of the Constitution provides that "[a]ll legislative Powers herein shall be vested in a Congress of the United States, which shall consist of a Senate and House of representatives." U.S. Const. art. I, § 1. Under the nondelegation doctrine, "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). Congress may, however, obtain "the assistance of its coordinate Branches." *Mistretta*, 488 U.S. at 372. In particular, Congress may "'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of [their] execution.'" *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, --- U.S. ---, 145 S. Ct. 2482, 2496–97 (2025) (alterations

in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). "So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (cleaned up) (internal quotation marks and citation omitted). When setting forth an "intelligible principle," Congress is not required to "prescribe detailed rules" but must "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

Consistent with these principles, the Supreme Court has only twice struck down federal statutes for violating the nondelegation doctrine: *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). In each case, Congress "had failed to articulate *any* policy or standard to confine discretion." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (internal quotation marks and citation omitted). In *Panama Refining*, for example, "the statute empowered the President to bar the transport of petroleum products while 'establishing no criterion' and 'declaring no policy' for whether, when, or how he should do so." *Consumers' Rsch.*, 145 S. Ct. at 2502–03 (cleaned up) (quoting *Panama Refining*, 293 U.S. at 430). The statute at issue in *Schechter Poultry*, which the Supreme Court described as "even worse," authorized the President to "approve 'codes of fair competition' for 'the government of trade and industry throughout the country,' yet imposed 'few restrictions' and 'set up no standards' aside form a 'statement of general aims of rehabilitating, correcting, and expanding' the economy." *Consumers' Rsch.*, 145 S. Ct. at 2503 (quoting *Schechter Poultry*, 295 U.S. at 521–22). But since 1935, and even as recently as June 2025, *see generally Consumers' Rsch.*, 145 S. Ct. 2482, the Supreme Court has rejected all other nondelegation challenges asserted against an

26

Act of Congress. The Court explained that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (internal quotation marks and citation omitted).

The Village argues that Section 5 is an unconstitutional delegation of legislative authority because it fails to supply an intelligible principle by which the Secretary of the Interior is to be guided. It asserts that Section 5 lacks minimal directives or guidance governing the Secretary's acquisitions, only the identification of the beneficiaries on whose behalf the United States should acquire the land: "for Indians." This, the Village contends, is "not enough." Dkt. No. 57 at 37. The Village explains, "The simple statement of who land may be provided to, 'Indians,' with absolutely no instructions as to when, for what purpose, how, why, how much, how often, under what conditions, without any consideration for use, or the impact on the states and their sovereignty is no directive at all." Dkt. No. 70 at 35. It argues that the lack of any intelligible principle has resulted in the "rubberstamping" approval of virtually every application. *Id.* at 36.

In support of its argument, the Village relies heavily on the Eighth Circuit's decision in *South Dakota v. United States Department of the Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated* 519 U.S. 919 (1996) (*South Dakota I*). There, the Eighth Circuit held that Section 5 of the IRA was an unconstitutional delegation of power. *Id.* at 880. It found that "when Congress authorize[d] the Secretary to acquire land in trust 'for Indians,' it [gave] the agency no 'intelligible principle,' no 'boundaries' by which the public use underlying a particular acquisition may be defined and judicially reviewed." *Id.* at 883. The court observed that Section 5 would "permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present." *Id.* at 882. The Eighth Circuit's decision, however, was vacated by the Supreme Court and predates

27

subsequent Eighth Circuit cases upholding Section 5 against nondelegation challenges. *See Dep't of the Interior v. South Dakota*, 519 U.S. 919 (1996); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790 (8th Cir. 2005) (*South Dakota II*).

While the United States Supreme Court and the Seventh Circuit have not yet addressed whether Section 5 violates the nondelegation doctrine, all other circuits that have addressed it have concluded it does not. *See United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999); *Carcieri v. Kempthorne*, 497 F.3d 15 (1st Cir. 2007); *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008); *see also Sauk Cnty. v. U.S. Dep't of Interior*, No. 07-cv-543, 2008 WL 2225680 (W.D. Wis. May 29, 2008). The Village criticizes these courts for using legislative history to establish Section 5's intelligible principle. It asserts that an intelligible principle must be established by "legislative act," not legislative history. Dkt. No. 57 at 40. But as the Supreme Court recently explained, its cases concerning nondelegation "did not examine those statutory phrases in isolation but instead looked to the broader statutory contexts, which informed their interpretation and supplied the content necessary to satisfy the intelligible-principle test." *Consumers' Rsch.*, 145 S. Ct. at 2503 (citation omitted). Courts must consider "the purpose of the Act, its factual background, and the statutory context in which [the challenged phrases] appear," *Am. Power*, 329 U.S. at 104, which includes legislative history, *Gundy*, 588 U.S. at 141–44. In the cases affirming Section 5's constitutionality, the courts analyzed the text, purpose, and statutory context of the IRA to do so.

For instance, the Eighth Circuit in *South Dakota II* held that "an intelligible principle exists in the statutory phrase 'for the purpose of providing lands for Indians' when it is viewed in the statutory and historical context of the IRA." 423 F.3d at 799. It also found that the statute places adequate limits on the Secretary's discretion, namely, that the Secretary must only acquire trust

28

lands for Indians as defined in 25 U.S.C. § 479 and is prohibited from taking extra-reservation lands into trust for Navajo Indians. *Id.* at 797. The court noted that the goals motivating trust acquisition are to further economic development and tribal self-governance. *Id.* at 798; *see also Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) ("The intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" (quoting H.R. Rep. No. 1804, 73rd Cong., 2d Sess., at 6 (1934))). The Eighth Circuit acknowledged that "the scope and power conferred in [the statute] is broad." *South Dakota II*, 423 F.3d at 797. But the court concluded "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department." *Id.* The First, Tenth, and D.C. Circuits used similar reasoning to find Section 5 constitutional. *See Roberts*, 185 F.3d at 1136–37; *Carcieri*, 497 F.3d at 41–43; *Mich. Gambling*, 525 F.3d at 30–33. Consistent with these cases, the court concludes that Section 5 of the IRA does not violate the nondelegation doctrine.

The Village raises legitimate concerns that it will suffer significant consequences if land within its boundaries continues to be accepted into trust for the benefit of the Nation under Section 5 of the IRA. Any claimed statutory inequity may only be remedied by Congress, however. The court realizes that it may ring hollow to advise the Village to go to Congress to seek a change in the law. But it is from that body alone that relief is available.

## CONCLUSION

For the foregoing reasons, the Federal Defendants' actions were not arbitrary, capricious, or an abuse of discretion. Furthermore, Section 5 of the IRA is constitutional. The Village's remaining constitutional arguments are dismissed. Accordingly, the Village's motion for summary

judgment (Dkt. No. 56) is **DENIED**. The decision of the Department of the Interior is affirmed.

The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff.

      **SO ORDERED** at Green Bay, Wisconsin this 2nd day of December, 2025.

William C. Griesbach
United States District Judge